Your argument first in number 2007, 1340, Kinetic Concepts against Blue Sky Medical. Now, as I understand it, Mr. Partridge, you'll be going first, taking seven minutes. Mr. Dunn will follow, presumably, on invalidity and infringement, if he so chooses. And in the event that he raises infringement, we will hear from both Mr. Ray on infringement, and then you, Mr. Partridge, on invalidity, with Mr. Dunner to follow, with three more minutes on infringement. So that's the way the arrangement has been set up? Yes, sir. Very good. You may proceed. Thank you. Thank you, Your Honor. Good afternoon. As you know, my name is Scott Partridge. I represent Medila AG and Medila Inc. in this case, and we have appealed the finding of validity below, and we have asserted two legal errors with respect to validity. The first concerns the obviousness finding, and the second concerns the definiteness of the claims. It's my intention here this afternoon to spend the six minutes and 30 seconds I have left discussing obviousness, and if the Court has questions about the definiteness, obviously, I'm quite happy to answer those. Why don't you raise anticipation on appeal? Your Honor, that arose primarily because of the lack of plain construction with respect to treating the wound, which was a fundamental issue below, and when we opted to pursue our appeal in what issues were the appropriate issues for appeal, we decided to focus on obviousness. But your question raises what is, I think, a very important point with respect to the construction of the term treating a wound, facilitating the healing of a wound. Because if you find that those terms should be construed as the Court initially did below, or as we asserted below, the Court should interpret those terms, and then you turn to the claims and begin the obviousness analysis, and you ask yourself the first question, are there differences? When you turn to claims like Claim 13, with that construction in hand, with respect to the public uses of character and cheater, distinguished from the article that was before the examiner talking about the public uses in the presentations, the discussions they had with other doctors, I think you will find that there aren't any differences, which is a quintessential state of obviousness in this case. But on claim construction, what is then the dispute? Are you advocating the district court judge's original construction of the injury, wound being an injury? If that's the case, I guess I'm wondering what difference it makes. We argue that the better construction, Your Honor, was the application of the understood meaning of wound at the time, which came from the Stedman Medical Dictionary, and a position that KCI took before the FDA as to the definition of wound with respect to these particular advices, which was more explicit and provided more guidance to the jury. When the Court instructed initially, or when the Court decided that the meaning of the term included giving medical care to an injury and stopped at that, that was a construction we felt that we could live with at trial because we thought that distinguishing a fistula from a wound would be easier for the experts to argue than saying that a fistula wasn't an injury. So I think it had a significant difference in how we went forward with the case with respect to the experts and the other witnesses in the case. The Court initially, he went through this with Judge Ferguson in clinical instruction, and initially he agreed with that. Ten days into trial, he changed the construction. Let me see if I can understand the follow-up on Judge Crow's question. As I understand it, it's the Stedman Medical Dictionary, is that what it is? You are saying that that's the construction law that we have? Yes, Your Honor. And part of the Stedman definition is resulting from a surgical incision, right? Something like that, right? One of two things, Your Honor, the first of which has to do with trauma to a tissue of the body. And then it gives an example. I can't remember exactly what it was, but it's in the briefs. And then the second example it gives is the one that you just identified, surgical incision. And your contention is that Charik or Jeter, in fact, was directed to fistulas caused by surgical incisions. They can be caused that way. They can occur in other ways, as I understand it, Your Honor, but that is the typical way that a fistula would occur during the course of a surgery. An opening would be created. The way it really was that if the Stedman definition were adopted, the fistulas that were treated in Charik or Jeter would come within that definition of the law. Yes, Your Honor. There wouldn't be a debate about it. And instead of that being left to the jury to decide, which was a central issue in claim construction, and indeed in our briefing and in a letter brief the court requested, we actually identified the problem and said this is a central issue in the case, Your Honor. If you don't construe this term, we believe that they will try to argue the interpretation to the jury through experts, which is what happened. And this is no different than what the court addressed in the O2 micro case, which was decided after our main brief but before our reply. I'm not sure that I saw that the claim construction was explicitly argued to the jury. Can you refer me to where that happened? Yes, Your Honor. It wasn't argued to the jury in the sense that we would at a Markman hearing, here's what the claim means. What instead happened was that during the discussion of the prior art, their expert in particular talked about the prior art as not disclosing treating a wound because it was a fistula. And if you look at the testimony of Dr. Orville at appendix page 204932, that's how he distinguished the prior art. That was the position that was taken in opening, in closing, and in the testimony of Dr. Orville. So the jury was left with respect to a term that appears in all 37 asserted claims, deciding what the term meant for purposes of applying the prior art. Six days of deliberation, and I don't know if they simply gave up, but we have the verdict that we have. And I think... But what about the fact, even if you're right, I mean, I think the other side points this out in their brief, that during prosecution, Chair Kajita was distinguished from the patent as a wound drainage device. Yes, Your Honor. And so wasn't there some basis that the jury could have relied on? Obviously, we don't know exactly what they relied on in order to sustain their obvious determination of non-obviousness. Yes, Your Honor, and they could have done that, but should they have been doing that rather than the court as a matter of claim construction? Just as in O2 micro, that sort of issue was left to the jury and the experts to debate it. And had we had a construction about does draining a wound, is that different than treating a wound? Was that a disclaimer or disavowal and the like? None of which was clearly contained in the briefing of KCI below. Instead, they argued for Duncan-Stewart, plain and ordinary meaning. Originally, they had some other constructions, but ultimately when we went to the market hearing, they said Duncan-Stewart. We've got four pieces of prior art that are really in play here with respect to the obviousness, and I understand the argument you've been making, and it seems to me it deals predominantly, if not entirely, with the fistula issue. With respect to the other three prior art, there's not a fistula or a wound issue, right? That deals with pressure on the wound and whether there's a screen or not and things other than what you're arguing here in terms of the wound claim construction, right? I do want to point out, and my time has expired, I'm eating into Mr. Ray's time. We'll make sure and keep the time separate so Mr. Ray won't be prejudiced to carry you over, but we'll allow Mr. Dunner an equal amount of time as we go beyond your time. Thank you. The Johnson article, the Spedman article, the Russian articles, there were a number of other pieces of prior art that were applied to the claims other than Sheriff Verjeer. There's some confusion perhaps because Sheriff Verjeer had multiple pieces of prior art that we relied upon as to what was before the examiner versus the other Sheriff Verjeer prior art, and the best Sheriff Verjeer prior art was not before the examiner. It was the public uses, the presentations, the poster presentations by Doctors Sheriff Verjeer ten or more times to other doctors in which they described the improvement in granulation, the improvement in healing of the skin and the like as part of those presentations, and a book chapter that they wrote that qualifies as prior art in which they were more expressive with respect to the results achieved. That's better prior art than the Sheriff Verjeer prior art that was before the examiner. You said that there was at least one piece of the chair computer that did not deal with the fistula, right? Yes. Where was that? That was amongst the various photographs, and I think we put all of these in our reply brief in a way that you could more easily follow them. There was a set of photographs. When you look at them, it looks like a fistula because you see the intestine in the photograph, but there was no hole in the intestine, and he describes it in his testimony as packed with gauze, with a drain in it, and looming it on until the wound had closed enough. It is true that at some point he stitched it up in order to release the patient from the hospital earlier, which oftentimes happens with all of us. This is what this selected stages of healing issue is about. At some point, you can employ an alternative therapy, with respect to the non-fistula application. If we were to construe, as you suggest, wound to be limited to skin wounds, is that the end of your obviousness appeal? No, Your Honor. First of all, when you have a fistula, you have a skin wound, and what actually is happening is that two healing processes are occurring. One is occurring in connection with the draining of the wound, which allows and permits, and there's no dispute in the record with respect to this, that improved granulation around the wound occurs. And then there's a second type of healing that occurs as you leave the device on the patient, and you see that in the photographs when you see a wound that is substantially open, and you see a series of photographs where the wound has been compressed to only being a small opening. That is the same type of healing that they claim was the intention of the invention here, but is also taught by the Cherokee public uses in presentations and the like that are in the record. I want to make sure I understand exactly what your contention is with respect to the proper definition of wound. Now, the Stedman definition seems to me to be pretty broad. Trauma to tissue will include presumably a broken leg, not a compound fracture, simply a simple fracture of the fibula. I don't think bones are considered tissue in that sense. Cartilage? Cartilage is tissue, right? Any bone, cartilage would be tissue, I think. I'm not certain of that. So you're really talking about soft tissue. Now, the second question is... Wounds have to be open, Your Honor. Open as in there has to be some skin penetration involved, I take it. Yes, Your Honor. Otherwise it doesn't make sense to put a negative picture of the device on. Well, at least you would assume so. All right. So when you say the problem with defining the wound as, not that the judge did this, but the problem with characterizing wounds as skin wounds is that it isn't broad enough to cover skin wounds that also involve deeper trauma, such as the fistula. Yes, Your Honor. If you limit it to skin wounds, a wound includes trauma that's below the surface of the skin. And, indeed, if this was just about skin wounds, this invention probably wouldn't make any difference. We're talking about chronic acute wounds that have been substantially open for a period of time, and it's not just in the layer of the skin. So this is not about... No, we're not talking about scratches here. I understand that. We're talking about severe open, draining disturbances of the skin in the subcutaneous layers. That's correct, Your Honor. And in the specification, they give merely examples of burns and ulcers and skin graft situations. They're all identified in the specification. The word skin is not used to describe these wounds. They give examples without narrowing the definition of wound. You won't find the word skin in the specification. So while it seems as though it's a position of the KCI at this point that there was some error in connection with the failure of the court below to construe the term wound, they argue that it was harmless. Did they argue at the Markman hearing that the term wound should be construed to be limited to skin wounds? They did not put that in a proposed definition to the court. During the course of the arguments at Markman, Your Honor, I can't recall whether they used those words as part of their argument. My guess goes back a while is that they probably did, but I'd have to go and look at the record to give you a precise answer to that question. Thank you. We'll hear next from Mr. Dunner. Thank you, Mr. Partridge. And Mr. Woodard, could you add seven minutes and 30 seconds to Mr. Dunner's time, and even if he needs it, please? In terms of court, Your Honors, I was going to make a more general statement to get into the obviousness case, but I think I would just as well respond specifically to the points that Mr. Partridge made, and hopefully I'll have time to go back. If we assume hypothetically that the Stedman Dictionary definition of wound is correct, why is it, in your opinion, that Cherokee jitter is not anticipatory? I understand we're talking about obviousness here, but why doesn't it create a prima facie case of obviousness? Because it is our view that Cherokee jitter does not treat a wound with negative pressure. What Cherokee jitter does, and this is true of the public uses, this is also true of the other references, what he does is he, it's a drainage system, he drains fluid from a fistula. But the fistulas in Cherokee jitter, at least many of them, were the result of surgical incisions. So in that sense, they come within the definition of wound in Stedman, right? Your point is that if fistula is included in why is it wound, is he treating the wound? Well, a fistula caused by a surgical incision would be within the definition of wound under Stedman, right? Using the dictionary definition, that is true. Okay. So if we do hypothetically say that that's the correct definition, then why, when Cherokee jitter would treat a fistula caused by surgical incisions, wasn't that a prior art reference which created a prima facie case of obviousness? Well, because there are other limitations that it would not satisfy. It doesn't satisfy, there's evidence to support this on page, on page 35, it doesn't contain the screen to prevent overdrive. It doesn't have, it doesn't, it would not make intermittent suction obvious. There are cases in obviousness for reasons I can go into. It doesn't satisfy the district court's claim construction of impermeable color because the district court construed that to have a water vapor transfer rate of less than 836, and there's nothing in there to suggest that. But I would like to address briefly why that definition, that dictionary definition is not proper. It's not proper because the specifications make it absolutely clear. They may not use the word skin, but they use a medical equivalent to skin in the summary of the invention. Before you go to that, could you tell us what you think the correct definition is? Before you justify the definition you're arguing for, could you tell us precisely what the definition is that you think ought to be adopted? Yes. How would you read wound to define it in terms of skin? Tissue damage, this is the definition that we've asserted. Tissue damage to the surface of the body, including the epithelial and subcutaneous layers, and the epithelial and subcutaneous layers are skin layers by any dictionary definition. But that definition says included. It doesn't say it's limited. It's to the surface of the body. That's where we get the skin? Yes. That's what was intended. It's the surface of the body, and to show you what we mean by surface, we're talking about the epithelial and subcutaneous layers of the skin. Okay. I'm sorry. Why don't you go ahead and tell us why that's the correct definition? Because the patent specification, for two reasons. The patent specification all the way through talks only of skin wounds. Every example is a skin wound. The summary of the invention is a skin wound. And right at the beginning on column four, line six through 11, it talks about applying a negative or reduced pressure to a wound over an area sufficient to prevent the migration of epithelial and subcutaneous tissue. So all the way through the specs, it talks only of surface skin wounds. Moreover, during the prosecution history of the original, of the 081 patent, the argument, the distinction was made that character of gender is not a proper reference against the claims because it treated a fistula. It distinguished the kind of definition that would be covered by the Svedman dictionary definition. It also distinguished over another reference. It distinguished over the Svedman reference and basically said the same thing. It does not have a screen to prevent overgrowth. And it talked about the negative pressure simply moving through the device. It's not pressure on the wound. So those are disclaimers. And the case law of this court says that when you have a disclaimer during the prosecution history, the claims should be limited to that disclaimer in both directions, our ability to accuse somebody of infringement and how those claims should be construed. So it is our position that, in fact, the definition should be as we have said it should be and that it should not be as in the Svedman dictionary. Now, yes. If you're done with that response, I'm curious about how you view the Johnson reference. The briefs don't spend a lot of time on Johnson, but that was a reference that I needed some help interpreting. The Johnson reference was a skin graft reference. Right. It shows that the negative pressure is used to immobilize the skin, not to treat a wound. To immobilize the graft? To immobilize the graft in its skin. To immobilize the skin. The skin graft over the wound. All right. But here's negative pressure. I mean, it's not doing – earlier you differentiated between drainage and negative pressure. Johnson isn't drainage, I take it. Johnson is a drainage device. It is drainage. It is a drainage device. All right. So it's taking fluid out and immobilizing the graft at the same time. Right. That's the idea. Otherwise the graft would tend to be separated from the subcutaneous layer by fluid. And we want to have it adhere. Yes. Is that the idea? Yes. And in the patent there are several skin graft examples. And the negative pressure is applied before the skin graft is put on in order to heal the wound, and then you add the skin graft. In the Johnson device, what they do is they add the skin graft, and then they put the negative pressure on the skin graft to immobilize. It's a very different system. And the testimony is on the Red Brief 31 and 32 that, in fact, it is the skin graft that's doing the healing of the wound. It is not the negative pressure. And our point is and has been that this is a JMAW motion, and under the rules of this court, all the facts are to be construed in our favor and that if there are any factual disputes, they should be resolved in our favor. So for that reason, I don't think Johnson is relevant. And I should mention, your audience will know, that we brought to the attention of the court a recent reexamination request that I just learned about on Saturday.  Cherokee Teeter and Spedman and Johnson and Davidoff were reconsidered and claims allowed, all the claims allowed, over Davidoff expressly and Spedman. So we think the court can take judicial notice of that, and our position, we feel, is reinforced by that. Now, they mentioned the public uses, and they said those public uses had information in them that weren't in the cases before the Patent and Trademark Office, and I submit, your audience, that in fact that is not so. Any information they had in them is not really relevant to the appeal. They talk about the public presentations do talk about, those public presentations do go beyond the drainage issue. They do talk about healing the incision, don't they? Your Honor, they talk about improved granulation. They talk about the non-fiscular patient. And our position is that whatever they talk about was before he was an examiner in the original prosecution was told about improved granulation of Cherokee cheetah. And our position is, perhaps I should just explain Cherokee cheetah, which is really a distinguishable reference. The public uses and the references before the examiner all refer to the same seven patients, and the way it works is you drain a fistula because the fluid from the fistula interferes with healing. What about the one example in Cherokee cheetah that didn't involve a fistula? We have pointed out, maybe we didn't point out because we had the red herb. That example, the witness who testified, Cherokee, Dr. Cherokee, was impeached because at his deposition, which was read to the jury, he said the wound for the non-fiscular patient was healed with sutures. No, I don't think he said it was healed with sutures. I think he said that the underlying tissue, not at the skin level, was sutured together. I thought that the testimony was that the wound healing, at least on the surface, was the result of the negative pressure rather than sutures. It wasn't sutured at the surface, correct? I don't know where the sutures, to what the sutures were applied. I am under the understanding that he did not use his technique to heal. There is some healing that takes place in a Cherokee cheetah system, whether you're talking about the public uses or otherwise, and I really didn't finish my point to explain that. The healing that takes place is if you keep the caustic effluent from the fistula away from the surface of the wound. But that doesn't relate to this one example that didn't involve a fistula. You have a problem if that one example, which was a public use, involved the surface of the skin, in other words, that it would fit within your own proposed definition of the word wound. And the suggestion is that somehow the jury found that he wasn't credible or could have found that he wasn't credible. I'm having a difficult time seeing what the credibility is because it seemed to me that the testimony and deposition were not inconsistent with each other. Your Honor, the suture issue comes up on, I'm looking for it in my notes, 202-978-80. It says, the quote is, the photographs depict an attempt to achieve primary closure by sewing the wound together. Is that right? Yes. And I interpret that to mean, Your Honor, that the healing was not other than the normal secondary healing, which we acknowledge takes place in a Cherokee Jeter system, but it takes place while you're trying to cure a fistula. But in this case, I read that as inconsistent with their argument that the Cherokee Jeter system, including the vacuum, was responsible for the wound healing in that non-fistula system. That is the testimony we're relying on. Let me just go to the last one. Do you have any other questions on that point, Your Honor? No. The last point I made was in response to a question that Judge Post asked, if the group consumes the claim to be restricted to a skin wound, do they lose? And Mr. Fletcher's answer was, no, there's a secondary type of healing. And that was the point I was getting to. There is no obviousness case based on Cherokee Jeter, because what happens there is, the effluent is the problem with preventing the wound from healing. And once you stop, once you control the effluent, which is what the drainage system is supposed to do, then the system is allowed to heal. Once that happens, the Cherokee Jeter system stops, and the wound just heals naturally, once you have cured the fistula problem. So anyone with the Cherokee Jeter reference in front of them would not think that in a non-fistula system, that system would work. The whole system is key to curing, solving a fistula problem, correcting the drainage problem that results from that, which impedes healing. So if you have no fistula, you don't have a drainage problem that impedes healing, there's no reason to use the Cherokee Jeter system. Now, we know the Cherokee Jeter was, in fact, mentioned in the re-examination, and the examiner nevertheless allowed the claims, except for claim 13, which the examiner did not allow. If I can just ask one quick question, a follow-up to Judge Brayton's question on Johnson, because I, too, had some doubts about Johnson. And that is, it seems that if, I know, your answer to him involves a specification that seems to me is an example four, and the specification that's problematic for you to get over. So I was relying, and I think one of your fallback arguments seemed to be, well, they use gauze, and gauze doesn't prevent outgrowth, which is necessary for the screen limitation. Am I right about that? Yes. But some of the claims don't have the screen limitation, right? Every one of the claims in the 081 patent has a screen limitation. There's a chart in the back of the red brief. And every one of the claims in the 081 patent has a screen limitation. Every one of the asserted claims. If you look at the third page from that. I'm talking about 643. In the 643 patent, that's right. Every claim doesn't have a screen limitation. And for a number of those claims, we rely on other provisions, such as treating the wound or impermeable cover or any one of the other limitations that we have. But if we think the skin graft comes under the definition of wound under the spec, then what we're left with, the only argument you're left with is the screen, right? The outgrowth is questioned that you distinguish based on the gauze not preventing outgrowth. And I understand that. You're saying if you can screw their skin graft in Johnson to be within the claims, then I missed your definition. Then what we're left with, I thought you argued in the brief, but I might be confused with another reference, that you're still left with gauze in Johnson. And that you say, so it's still distinguishable. Yes. Because it doesn't prevent the screen from preventing the outgrowth. That's exactly right. Right. But that argument would not apply. If that's the argument we're left with, that would not apply to all the claims in the 643 patent. In the 643 patent, there's no screen. Well, there's still no screen. In certain claims. Not all the claims. Well, there's still some claims calling for intermittent suction and there's some claims calling for impermeable cover. So we still have other limitations which we'd have to apply to. Now, you only mentioned that there's one example that's problematical. Example four. Same to me. I'm going to go back to it in a sec. But I can't. I mean, the example four, the treatment of flops on column 17. The one that we have. Yes. I guess I would have to have a hard time distinguish the discussion at the end. On 63. 63 talks about the flops were created at a depth immediately below blah, blah, blah. I guess you might want to repeat the argument you made with respect to flops because I was having a hard time. This is a, as I understand it, this is a treatment of flops. It's not a skin graft. My understanding is that that is not a skin flap survival. Nobody has paid much attention to that example. So I don't know that it's been raised very much. In the patent, maybe I was confused, but in column 12 when they talk about flaps, they discuss the integration of a flap or a graft. So I thought perhaps those terms were used interchangeably. I understand that there are some other claims directed to that particular example. And those other claims, if I recall at the end of the 643, the patent, what claims were they? I understand there are some other claims specifically directed to a flap, Your Honor, rather than take up. I see I'm running out of time. Can I ask you one more question? Yes. I want to come back to this claim construction issue, which is obviously important. In favor of your surface claim construction, you said the checker gear was distinguished before the examiner on the ground that it involved fistulas. The question I have is, in distinguishing it before the examiner on the ground that it involved fistulas, was the focus on the idea that it was drawing the fistula rather than healing the wound? Yes. The statements in the prosecution history talk specifically about the fact that the healing of the wound was secondary rather than primary. And specifically, what we said was that character does not disclose any means of directly accelerating the healing process. The only effect of the device disclosed by character at all, as on wound healing, is improved granulation, which is only a secondary effect of draining the wound. In contrast, Afton's claiming mentioned ways to a device for directly accelerating the healing process. That's on page 835.10. That's what he said about the character reference. So that's short of saying that the patent here doesn't cover fistula situations. Well, it basically says that, in short, I was adding language, that the character relates to a wound drainage device and not to a device for primary wound healing. Okay. I understand. I understand what was said. Thank you. We've occupied you considerably with our questions. If you want to address briefly the infringement issue, in order to put that issue in play, Mr. Ray would probably be happy if you would say something about it so that he can speak finally. Basically, the situation on infringement is this. At the trial, they never applied claims against the accused device. What they did was they basically set forth a practicing the prior art defense. And we submit that practicing the prior art defense is not a proper defense under the case law of this law. They also compared, before the jury, their device to our device without regard to claims. They said, is this closer to the prior art device or is it closer to our device? That is not a proper approach to infringement. So what did they do on appeal? They're not even raising the practicing the prior art defense. They're not raising it's closer to one than the other. They raised four different arguments supporting their case. One is that the specs don't disclose APA IV or any other non-adhering holding, and our position is it doesn't have to. It doesn't have to disclose. The specification does not have to disclose the specific accused product. The question is, do the claims cover the accused product? They also said that the testimony of Dr. Orvio was conclusory on counteracting force to prevent overgrowth. It's not conclusory. It's reinforcing testimony of two of their witnesses, one of their witnesses, Hoff, for one, and one other witness who actually said exactly that, that that is what happens when you use a screen, and all he was doing was reinforcing that testimony, and so that doesn't help them. Let me step in just quickly as Dr. Orvio. Was Dr. Orvio your own KCI's only witness? Yes, he was our expert. That's exactly right. My point is that they don't really have any independent testimony comparing claims to a product, and they're basically left with these three or four items, which we don't feel are substantial evidence supporting a jury verdict. Now, on the induced infringement, I would just like to mention two things. One is there's evidence of some confusion here. There's evidence of direct infringement from the evidence that Blue Sky told its distributors that, and I quote, the use of the intermittent pressure mode on the versatile worm was sometimes successful at A20489. But that's sort of thin in terms of evidence that there was direct infringement because they said that the standard was continuous pressure, and they said sometimes intermittent pressure is okay. It seems to me that if there were an instruction to do it in a particular way as a routine matter, you might not need separate evidence of direct infringement. But where you say the routine is continuous pressure, but sometimes intermittent pressure could be used for short of proving direct infringement. Your Honor, their instructions say use continuous or intermittent, and if we have evidence that in fact they used intermittent, it seems to me that that is a solid case for proving an infringement. Well, that's the problem. That's the problem, whether there was evidence of direct infringement by customers as opposed to the instructions being used in and of themselves to show inducement. You have one nurse you're saying that testified to the use of the product with intermittent infringement? That is our evidence. There's another piece of evidence by, I believe, a nurse, which they have challenged, and rather than to get involved in a debate on that, I'm focusing on this piece of evidence, 204829. That's our evidence of direct infringement. That's not clear, induced infringement. Induced, right. But are there two nurses or one? The one nurse that I was thinking of that I think is the same nurse that Judge Dyke was thinking about, as to whose testimony your opposing counsel said, well, they weren't referring to the accused device. She wasn't referring to the accused device. That was supposed to debate as to whether that might have been Rothbard. I don't remember the name of the nurse.  There might have been. I don't know, Your Honor. You said you're not relying on the first nurse. We're not relying on her. Keep in mind that there are three kits. There are six kits altogether, three without the Aquaphor and three with the Aquaphor. As to the kits with the Aquaphor, we submit that that is a direct infringement by Blue Sky, and the Golden Blonde case, which we cite, it says direct infringement can be inferred from the sale of kits with instructions where no evidence that uses ignored instructions. That's as to the use of Aquaphor. So we feel as to three kits, we have a solid case based on that. As to the other, we are relying on this evidence that I told you about, 8204829. Very well. Why don't we let you sit down now if you're at a stopping point. We will reserve some additional, I suppose, sir, a little time for you, and we will give Mr. Partridge, who I think is up next, and then we'll give, did you want Mr. Wray to go first here? It's your choice, Your Honor. Mr. Wray could address infringement. I could then address infraction validity, or we could do infraction validity. Well, I tell you what, since we've just been talking about infringement, maybe we'd better continue with Mr. Wray, and we'll give Mr. Wray an extra, Mr. Whittier, could you give Mr. Wray an extra four minutes, and we'll give Mr. Partridge an extra four minutes. He had five, so he'll go up to nine. Mr. Partridge had three, so he'll go up to seven. Thank you, Your Honor. May it please the Court. I do want to address the screening claims. That is the vast majority of the claims. There's only two claims that are not under the category of screenings. First of all, there were more than six kits. There were up to 18 kits. And now in the great brief on page 7, KCI admits the judgment is correct with regard to some of the kits. They are not appealing. Maybe I'm not understanding. I thought they were saying that the method claims about intermittent pressure were an alternative ground for finding infringement of the kits that didn't satisfy the screenings for screening limitations. Am I misunderstanding? I'm not sure. The point I was making was that there are kits that have no screenings. Right. And I thought as to those, they were saying there's an alternative ground for finding infringement because there was induced infringement of the intermittent pressure claims. There are some claims within the screening claims that require intermittent suction also. No, no, but I thought there was, under the other patent, they were saying there was infringement of these intermittent pressure claims which applied to the kits that didn't have the screenings. Yes, there's two claims now that are in the 643 patent, Claim 14 and Claim 29. Am I really addressing your statement? You said they conceded that the judgment was correct as to some of the kits. It seemed to me that they weren't conceding that. They were saying to those kits that didn't satisfy the screenings limitation that they could still rely on these alternative claims where there was induced infringement because of intermittent pressure. Well, except their brief is a little more conciliatory than that. At the bottom of page 7 of their great brief, they say that KCI is not challenging the jury's non-infringement verdict with respect to every accused product. Now, I take that because I take that as a clear concession that some of the products, they cannot make out an infringement case. But even if we view that as, okay, maybe they think there's inducement, the problem we have is that some of the kits don't contain Aquaphor and another kit isn't even used with Aquaphor. So even if they have an inducement theory, the Dermavix kit isn't used with Aquaphor at all. So the problem we have here is that KCI never, ever sought any separate relief with regard to different groupings of the products. So it is impossible, I think, at this stage now to break up the products. Well, why can't we, if we're persuaded by the evidence, because the evidence is such that there was absolutely nothing to support a jury verdict with respect to 10 out of 20 accused products, why aren't we free to set aside the jury verdict with respect to those 10? Well, that has never been done before, and I believe this court's case law is pretty good, suggesting that this court won't do that. In fact, the LMW case at 471 Fed Third at 1317 It's a jury judgment case. It's not a jury verdict case. Well, I think that's helpful, more helpful to us than the jury verdict situation, because clearly there's substantial evidence to support the verdict on some of the products. They can see that. But more importantly, and so we don't get caught up in this procedural issue, the jury was certainly free to find that the Aquaphor cause did not meet the claim construction of the screen means. Now, Mr. Dunner made a case here to you today that somehow it was the defendant's fault, or the defendant made an argument that doesn't justify non-infringement. But it was the plaintiff who bore the burden on infringement, and the plaintiff's only witness was Dr. Orville, and Dr. Orville did not apply the claim construction. He never said that the Aquaphor cause applies a counteracting force to prevent overwork. Never said that. So you'll notice what KCI is doing in their brief, and Mr. Dunner did it here today, they have to go to the invalidity expert of Dr. Hoff, the devil's invalidity expert, in order to make it seem like there was some testimony that the Aquaphor cause applies a counteracting force to prevent the overgrowth of tissue. The problem with that, number one, it doesn't say what Mr. Dunner says it says. What Dr. Hoff was talking about was the prior art that used flopped gauze to fill the dead space. It's the flopped gauze below the impermeable cover in the prior art that applies forces. Do you know what kind of gauze is used in Johnson? Prior art in Johnson? Uh, no. Because I thought KCI's position with respect to Johnson is that the gauze didn't satisfy the screen limitation. But I don't know, right now I'm confused as to what the differences in gauze are and which one we're talking about. So am I. They could not make out an infringement case and at the same time account for the prior art gauze. That's precisely the point. I'm just as confused as you are. All I know is they made an infringement case that rested on the presence of Aquaphor, which is simply an incriminating gauze. But they don't want to say that the flopped gauze applies a counteracting force because the minute they make that argument, there's many prior arts that all use flopped gauze to fill the dead space. And that is the real crux of this case, in that the infringement case and the invalidity case are incomprehensible relative to one another. They cannot draw the line of including Aquaphor and excluding the prior art, because Aquaphor is just gauze with petroleum jelly on it. Let me go back to the first procedural point, however, would you? So if you view that under our case law, I mean W and whatever else there is, if they had objected to the jury instruction, would that be sufficient? That would certainly make a major difference. In this case, what I find makes this case a little different than any of the other cases so far, the court specifically told the parties, recommended that the verdict be more specific so it will be able to carve out, which is the phrase the district court judge used, the district court was concerned, and the defendants were concerned, that the plaintiff's expert never made any quantity in order to base the damages case. Their expert just lumped them all together, as did the opening statement, the closing, the Aquaphor, nobody differentiated among the products. That sounds like an argument that they didn't prove damage rather than liability. And the jury didn't reach the damages question. Correct, and that's why the steel flex case that they discussed is not really helpful. When there's a verdict of infringement, then the court has the ability to remit or lower the damages amount. But it's a different situation when the jury finds no infringement, and here the jury is entitled to find no infringement. The Aquaphor cause, and the reason why it was confusing, whether we were talking prior art or the non-infringement defense, is because they couldn't draw that line. They couldn't draw the line. But my only point was the judge gave the parties the option, he implored them to be more specific in the verdict form, and they both declined. Now that's not oversight on anyone's part, because if they had found infringement, they would get the benefit of it covering all the products. And the unfairness that they are arguing, and I know there's no case directly on point, but let's assume that the jury, that there wasn't infringement of one or more products. Let's assume that for sake of this discussion. The problem is the plaintiff would always get two bites of the apple. He'd go for all the products, maybe lose, get a partial reversal, and then he has a tails-on-win, heads-you-lose type scenario. That's unfair. But he's taking a risk because he may have given you that option to double-deal, because you know if he had won with respect to infringement, you'd be here arguing the same way he's arguing, right? That some of the products do not infringe, clearly do not infringe. But then you have the option of scaling back the damages. You see, the problem is we don't get that luxury when the jury finds no infringement. The point is the plaintiff, who bore the burden of proof, never differentiated among the products. Never once. And so all we have is a jury verdict form that simply says, the versatile won system. That's it. And now they're conceding some products don't infringe, and are coming up here hoping to get a reversal on some of the products. I think that's improper. I think that gains the system. I think that's a waiver. But regardless, the jury in this case easily could have concluded that aquifer gauze alone does not meet the district court's claim construction of the screen means. And that definition required counteracting force to prevent the overgrowth of the tissue. Nevertheless, does Dr. Weber ever say that aquifer gauze accomplishes such a result? Apparently Mr. Corkridge doesn't agree with you on that. Oh, I think he agrees with me. Because the prior art and the Hawke testimony all show Does that mean in his argument for obviousness that it does satisfy those limitations, the screen means limitations? Well, if I understand his argument, it's in combination with the fluff gauze, which is in the prior art. Their infringement theory was aquifer alone, because they didn't want to include the fluff gauze. But you said that aquifer and fluff gauze are the same, right? In isolation, but the problem is we're talking about them used together. Aquifer gauze actually is just a slice of gauze with petroleum jelly. The fluff gauze is many, many feet, packing the wounds with the ephemeral cover over it. And clearly you need the fluff gauze to have the counteracting force. That is in the prior art. But they didn't want to say that was an infringement. They wanted to say aquifer alone is the infringement. It makes no sense. That's why I think Judge Brooks and I are confused as to how they can draw the line on infringement and belief. They can't. Thank you. Thank you, Mr. Wright. And now, Mr. Partridge, we gave you, I think, let me make sure that we're allocating the time correctly here. I think we need one more minute, Mr. Woodard, for Mr. Partridge. All right, there we go. Okay. May I deal with a couple simple issues first? The first concerns the skin graft question you asked about patent. And if you look at claim 37, which is on appendix page 337, this is a claim not asserted in the case addressing attaching a graft to the wound. It's not a flap. It's a graft to the wound. And that's what one of the examples is in the specification. And, indeed, in this re-exam that Mr. Dunn referred to, this claim, I studied the last action in the re-exam, but this claim was amended substantially in order to distinguish the prior RFA. Claim 37, is it column 26? I'm having a hard time finding that. Oh, I'm sorry. Claim 38. Oh, okay. Claim 38. So that's the first issue. And the second concerns the re-exam itself. Filed by a third party, and as I understand it, there are several re-exams pending, and the one that they notified the court about just recently concerns, I believe, an application of a Spedman article and a Spedman patent and a combination of those two different from anything that we argued below. We did argue the Spedman article, but not consistent with that. And that re-examination, I believe, is an ex-party re-examination in public uses and presentations of the sort which are among the principal prior art we presented to the jury below. Of course, they're not before the exam. Great confusion caused below because Jericho Jeter is a multiplicity of different types of prior art, so we should be careful in talking about the re-exam as to what is actually before the examiner. We also talked about in response to some questions about the limitation treating a wound and what definition or interpretation they would propose for it. And the court correctly noted that in their interpretation below, they included the language including without limitation. It wasn't excluding a fistula. It was including the epithelial and subcutaneous layers. Now, why did they do that? What about the prosecution history? We've got to get to the heart of those things. I don't want you to consume all your time with the small stuff. And you're right. That's exactly where I was going. They have dependent claims that address a canister for collecting drained fluid from the wound. They accused us of infringing some of those claims. What's the point? I don't understand the point of that. The question is whether they distinguished Jericho Jeter in the prosecution on the grounds that it involved fistulas. And if they did, what did they say about it? Did they say that Jericho Jeter is different because it involves drainage, or did they say it's different because it doesn't promote wound healing? With respect to the Jericho Jeter article that was before the examiner on appendix page 3510, they talk about what Jericho Jeter relates to. And they say it relates to a wound drainage device and not to a device for promoting wound healing, and then acknowledge that there may be some secondary effect with respect to wound healing. It does not rise to the level of a disavowal or a disclaimer. And, indeed, they did not argue that below. With respect to their claim construction, they wanted to have it both ways, and they included a limitation that was not exclusive with respect to draining a wound, which is also part of healing a wound. Though Jericho Jeter public uses and presentations went beyond the mere draining and talked about other aspects of healing a wound, the truth of the matter is these claims, as written and as argued before the court below, do not even exclude draining a wound as an aspect of treating a wound. Indeed, they include canisters to collect the fluid that's drained from the wound. So I don't think that they can come here and now ask this court to construe this limitation as excluding fistulas. Of course, if you decided to do that, if you thought there was a disavowal or a disclaimer, I think we'd have to go back, as in O2 micro, and visit the issue again with another jury. I don't believe we need to do that. I think this is more like the Fondestam case in which you were able to rule on obviousness and make a determination. Here, with respect to at least some of the claims, Claim 13, Claim 16, and some others, there are no differences that are material. And with respect to those claims, I think it's easy for you to enter a judgment of obviousness. With respect to some of the other claims, we are left with- I don't know about Mr. Daniels' argument with respect to chair procedure and the one example of public use that didn't involve fistulas. He says that involves suturing the skin. Is that correct or not correct? Your interpretation of that evidence is consistent with my own, Your Honor. There was a- I believe it was the small intestine that had so protruded from the wound that he needed to get it back into the wound, and he employed sutures, underlying sutures, in order to do so, and then applied his- but there was no opening in that intestine- and then applied his device to facilitate the healing process. My recollection is that at some point, as the photographs show, when the wound was sufficiently closed, a doctor has a choice. Do we keep the patient on the negative pressure wound therapy device for an extra week or two weeks to close it completely, or is it in a position such that the skin will allow for the suturing the wound at that point so we can send the patient home? And there is evidence in the record about those sorts of choices that doctors make. But the point about the non-fistula patient is that the application of this device facilitated the healing of the epithelial and subcutaneous layers as well as dealing with the problem with the intestine projecting from the wound. I would point the court, because I think that the reply brief that we submitted walks you through the public use evidence in the photographs along with the testimony related to that in a very easy-to-follow, clear way that I think will enable the court to conclude, as we do, that this is a case in which there isn't a dispute with respect to those facts and that there is simply legal error because the court below never did an analysis in response to our motion for judgment after the jury verdict. So at least as to some claims, we believe you can enter judgment. As to other claims, I think you can. You may have to get to the substantial evidence issue in the process, but I think even if you do as to those claims, the added devices are used in their normal, predictable way. There are no way of use. There isn't something with respect to those detailed claims that really adds to the non-obviousness of this case. Thank you very much. Thank you. Mr. Denner, I think you have about three minutes left, if I've kept track. Probably at least. Your Honor, at that time, I'm restricting myself to infringement. Very good. Since I think that's what I'm supposed to do. That's correct. I just wanted to make sure we're on the same page. We are. Mr. Ray talked about the all-or-nothing point that he made when he cited the L&W case because we are seeking a finding of infringement only as to six kits, and we're not seeking it as to other kits. The all-or-nothing cases that he cited, three of them, L&W, Is this correct that there's some kits you admit there's no infringement? No, we're just not pursuing them on appeal. We are restricting our appeal to six kits. We're not saying that there's no infringement. We're just restricting ourselves to six kits. But even if we said there was no infringement, I submit there's no difference. The point is, the cases he's talking about, the all-or-nothing case, L&W being a perfect example, the party came in and he said as to one product it has a certain feature, and then he said all the products have that same feature. He put all the products in the same basket. We have not done that. The evidence, including a chart from the defendants, shows which charts have GAUs, which charts do not have GAUs, and the dialogue came up in the context of damages, and that chart is on page A10234. It shows the kits and it shows which ones have and which ones haven't. We're not putting all our eggs in one basket. This is not an all-or-nothing case. If we can prove infringement of a single kit, we are entitled to go to the jury on damages, and then the jury will determine whether we get a lot of damages or less damages because we're only asserting a single kit. In this case, we're asserting six kits. None of those cases deals with a fact pattern like ours, where we, in fact, have distinctions based on specific kits and what those kits contain. So I think that all-or-nothing argument is a red herring. Going back to the testimony as to whether or not there is a screen which basically imposes a counteracting force to prevent overgrowth, they never challenged that below. That is not a point they challenged. The testimony of Orgill basically says just that, and the testimony also says that the fluffed, saline-soaked cotton gauze placed over the drain in Charlotte Jeter simply absorbs the drainage and would not prevent tissue overgrowth. So there is evidence in the record, and there's no evidence contrary to that because they never have taken the position that that particular gauze did not infringe. I think that basically is all I have to say unless there are questions from the bench. Thank you very much, and we thank all counsel. The case is submitted.